IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN PETER SNYDER                    :          CIVIL ACTION
                                      :
              v.                      :
                                      :
KILOLO KIJAKAZI, Acting               :          NO.  21-1412
Commissioner of Social Security[1]    :

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                             October  21, 2022

Kevin Peter Snyder ("Plaintiff") seeks review of the Commissioner's decision

denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI").  For the reasons that follow, I conclude that the decision of the

Administrative Law Judge ("ALJ") is supported by substantial evidence.

I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB and SSI on August 9, 2017, alleging that his

disability began on May 1, 2017, as a result of herniation in the lower back, buckling of

his right leg, chronic neck, shoulder, and hip pain, moderate depression, irritable bowel

syndrome ("IBS"), gastroesophageal reflux disease ("GERD"), optic nerve hypoplasia,

and attention deficit disorder ("ADD").  Tr. at 237, 238, 367-68, 374-76, 492.[2]  Plaintiff's

---

[1]Kilolo Kijakazi is currently the Acting Commissioner of Social Security, see https://www.ssa.gov/agency/commissioner/ (last visited Aug. 12, 2022), and should be substituted for Andrew Saul as the defendant in this action.  Fed. R. Civ. P. 25(d).  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]To be entitled to DIB, Plaintiff must establish that he became disabled on or before his date last insured.  20 C.F.R. § 404.131(b).  Although the ALJ indicated that Plaintiff's date last insured was September 30, 2021, tr. at 11, 13, administrative records

applications were denied initially, id. at 243, 248, and Plaintiff requested a hearing before

an ALJ.  Id. at 253.  After holding a hearing on September 23, 2019, id. at 132-73,[3] the

ALJ found on October 16, 2019, that Plaintiff was not disabled.  Id. at 11-29.  The

Appeals Council denied Plaintiff's request for review on January 19, 2021, id. at 1-4,

making the ALJ's October 16, 2019 decision the final decision of the Commissioner.  20

C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on March 24, 2021, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 17-19.[4]

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

---

state that the date last insured is March 31, 2019, id. at 207, or possibly March of 2020.
Id. at 385.  I can find no explanation for the discrepancy or any support for the September
2021 date.  However, because Defendant does not dispute the date, I will assume the date
cited by the ALJ is correct.

Plaintiff applied for benefits on two prior occasions.  March 2008 applications for
DIB and SSI were denied initially and Plaintiff did not seek further review.  Tr. at 208,
223.  September 2011 applications for DIB and SSI were denied initially, by an ALJ, and
by the Appeals Council when it denied the request for review, from which Plaintiff did
not seek review in the federal court.  Id.

[3]The ALJ initially convened the hearing on April 2, 2019, but continued the
hearing to allow Plaintiff the opportunity to retain counsel.  Tr. at 177-89.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal
Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

months." 42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

3

whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   **DISCUSSION**

### A.   **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffered from the severe impairments of depressive disorder, ADD,[5] and IBS.  Tr. at 14.  In addition, the ALJ found that Plaintiff suffers from the non-severe impairments of obesity, strain of the lower back, shoulder, and thorax, GERD, asthma, tendonitis of the left rotator cuff, sprain of costal cartilage, reflex sympathetic dystrophy of his legs, optic nerve hypoplasia, mild cervical degenerative disc disease, Tourette's syndrome, bradycardia, kidney stones, developmental coordination disorder, and vertigo.  Id.  The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 15, and retained the RFC to

---

[5]The ALJ specifically identified "attention deficit disorder" as a severe impairment, but used the abbreviation "ADHD," commonly used for attention deficit hyperactivity disorder.  Tr. at 14.

4

perform light work with limitations to "occasional postural maneuvers; simple, routine, repetitive tasks; only occasional interaction with co-workers, supervisors, and the public; no production-pace work; a stable work environment (defined as duties will not change on a daily basis); and never tolerate exposure to unprotected heights or unguarded moving machinery." Id. at 17.  In addition, the ALJ found Plaintiff would be off task approximately 10% of the workday to account for extra bathroom breaks.  Id.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform his past relevant work as a home healthcare worker and plant care worker/merchandise deliverer, id. at 26-27, but could perform other work in the national economy, including work as a price marker, laundry folder, and hand packager/inspector. Id. at 27-28.

Plaintiff claims that the ALJ erred in failing to include any limitations relating to the marked limitation she found in Plaintiff's ability to adapt or manage himself, and by disregarding critical evidence resulting in a flawed RFC assessment.  Doc. 17 at 6-19.  In the alternative, Plaintiff argues that the case should be remanded for consideration of new and material evidence.  Id. at 20-22.[6]  Defendant responds that, substantively, the ALJ's decision is supported by substantial evidence, and procedurally, Plaintiff has not met his burden to establish entitlement to a remand to review new evidence.  Doc. 18.  In reply, Plaintiff contends that Defendant failed to rebut Plaintiff's arguments.  Doc. 19.

---

[6]Plaintiff initially raised a separation of powers challenge relying on Seila Law, LLC v. CFPB, 594 U.S. __, 140 S.Ct. 2183 (2020), Doc. 17 at 4-6, but withdrew this claim in his reply brief.  Doc. 19 at 1 n.1.

### B.   <u>Plaintiff's Claimed Limitations</u>

Plaintiff was born on February 16, 1982, making him 35 years old at the time of his application (August 9, 2017), and 37 years old at the time of the ALJ's decision (October 16, 2019).  <u>Tr.</u> at 367, 374.  He completed high school in special education classes and received a nurse's aide certification.  <u>Id.</u> at 141, 493.  Plaintiff has worked as a home health care assistant and a hydroponics worker.  <u>Id.</u> at 138-41, 494.[7]

Plaintiff explained that the main issue that has kept him from working is his IBS.[8] <u>Tr.</u> at 142.  He testified that he has accidents every day or every other day, and had to stop three or four times for bathroom breaks on his way to the hearing.  <u>Id.</u> at 148-49. Plaintiff estimated that he has to go to the bathroom 20 -to- 30 times a day.  <u>Id.</u> at 149. Plaintiff also testified that he has problems with his neck, back shoulders, and hips, and when he goes shopping, he has to sit down every 15 -to- 20 minutes.  <u>Id.</u> at 137, 141.  He described chronic pain in his back and hips, and a sharp or numbing feeling in one of his legs.  <u>Id.</u> at 157.  Plaintiff also suffers from a head tremor that he has had since he was a child, and testified that it is becoming more problematic because he cannot focus, it affects his vision, and causes him to feel dizzy.  <u>Id.</u> at 153-54.  In addition, Plaintiff's Tourette's syndrome causes a tic in his eye.  <u>Id.</u> at 155.

---

[7]At the administrative hearing, Plaintiff testified that he was then working about eight hours a week with adults with mental disabilities.  <u>Tr.</u> at 141, 150-51.  Plaintiff also did some pet sitting, but not on a regular basis.  <u>Id.</u> at 163-64.  The ALJ did not include these jobs in Plaintiff's past relevant work.  <u>Id.</u> at 27.

[8]IBS is "a common, chronic, noninflammatory condition characterized by abdominal pain and altered bowel habits (diarrhea or constipation or both), but no detectable pathologic change; there may be spasms of the intestinal muscles."  <u>Dorland's Illustrated Medical Dictionary</u>, 32nd ed. (2012) ("<u>DIMD</u>"), at 1835.

Plaintiff also suffers from depression and anxiety and explained that he feels like he is a burden, does not want to get out of bed and has episodes once or twice a week where he cries uncontrollably for up to ten minutes. Tr. at 157-58. Plaintiff also discussed an incident two years prior when he went to the hospital because he was thinking about hurting himself. Id. at 152-53. Although Plaintiff testified that he no longer wants to hurt himself, he did discuss feeling despondent. Id. at 153. He also has anxiety which causes racing thoughts and difficulty sleeping, and panic attacks three or more times a month. Id. at 158-59.

The VE classified Plaintiff's home health aide work as medium, semi-skilled work. Tr. at 166. The hydroponics work was a composite of a plant care worker, which is medium and semi-skilled, and merchandise deliverer, which is unskilled medium work. Id. at 167. The ALJ asked the VE to consider someone of Plaintiff's age, education, and work experience, limited to light work, who could occasionally perform all postural movements; who was limited to simple, routine tasks with only occasional interaction with co-workers, supervisors, and the public; who could not do production rate or assembly line pace; who required a stable environment defined as one where the duties will not change on a daily basis; and who could not work at unprotected heights or near unguarded moving machinery. Id. at 168. The VE testified that such a person could not do Plaintiff's past work, but could do the jobs of price marker, laundry folder, and hand packager/inspector. Id. at 168-69. When asked about additional bathroom breaks, the VE explained that employers will allow "up to about 10 percent of the work day off-task,

in addition to breaks," and that the need for four additional daily bathroom breaks from 10 -to- 15 minutes each would be work preclusive.  Id. at 170-71.

    **C.**    **Summary of the Medical Record**

        1.    Physical Impairments

Plaintiff has a history of back and neck pain predating his alleged onset date, diagnosed as a chronic pain syndrome, for which his primary care practice prescribed Neurontin[9] and referred Plaintiff to a neurologist.  Tr. at 794-95.  Plaintiff strained his neck and back moving a treadmill at work on February 23, 2017.  Id. at 649, 651, 715-19. Examination of his back revealed tenderness in his lower middle back.  Id. at 717.  He was prescribed Tylenol with codeine and Flexeril.[10]  Id. at 719.  After Plaintiff was treated by a chiropractor and completed a course of physical therapy, id. at 626-41, 722-66, Leonard Brody, M.D., conducted an orthopedic evaluation on May 3, 2017, when Plaintiff continued to have pain in his back and neck.  Id. at 651-55.  Plaintiff reported his current medications as gabapentin and tizanidine.[11]  Id. at 652.  The doctor noted that his physical examination was "significantly inconsistent" in that "[t]he patient showed

---

[9]Neurontin (generic gabapentin) is an anticonvulsant also used to treat neuropathic pain.  See https://www.drugs.com/neurontin.html (last visited Oct. 3, 2022).

[10]Tylenol with codeine is a combination medication used to relieve moderate to severe pain.  See https://www.drugs.com/mtm/tylenol-with-codeine-3.html (last visited Sept. 27, 2022).  Flexeril is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle conditions such as pain, injury, or spasms.  See https://www.drugs.com/flexeril.html (last visited Sept. 27, 2022).

[11]Tizanidine (brand name Zanaflex) is a short-acting muscle relaxer used to treat spasticity by temporarily relaxing muscle tone.  See https://www.drugs.com/tizanidine.html (last visited Sept. 26, 2022).

significant histrionics with complaints of pain[, facial grimacing, and sighing] with maneuvers that I felt were out of proportion to the degree of stimulation that I was providing." Id. at 652. The doctor noted that Plaintiff had a "markedly positive straight-leg raising test bilaterally at 10º that caused low back pain, but a negative sitting root test bilaterally,"[12] which "is also an inconsistent finding." Id. at 653. Dr. Brody noted full range of motion of Plaintiff's cervical, thoracic, and lumbar spine, no muscle spasm, no objective evidence of either cervical or lumbar radiculopathy, and normal examination of the shoulders. Id. at 654. The doctor concluded that he saw "no reason why [Plaintiff] would benefit from any ongoing active medical treatment." Id. at 655. On May 23, 2017, Heather K. Hart, M.D., a physician at Plaintiff's primary care practice, noted that Plaintiff's pain was controlled. Id. at 778.

On September 15, 2017, Plaintiff was seen at the Grand View Hospital Emergency Department and admitted for an overdose of tizanidine. Tr. at 667-70. He was released with instructions to continue outpatient treatment at Penn Foundation. Id. at 673. When he followed up with his primary care practice on September 19, 2017, Dr. Hart noted that Plaintiff complained that pain from his work accident inhibits his sleep, that he has a feeling of being "jolted around in many directions" when he stands and walks, that his

---

[12]The straight leg raising test is performed to determine whether a patient with low back pain has an underlying herniated disc, requires the patient to be in a supine position and to lift his or her leg, and is positive if pain is produced between 30 and 70 degrees. Johnson v. Colvin, Civ. No. 09-2228, 2014 WL 7408699, at *5 n.17 (M.D. Pa. Dec. 30, 2014) (citation omitted). The sitting root test (also known as the sitting SLT) is a variation that requires the patient to be sitting when the legs are raised. Id.; see also https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Sept. 22, 2022).

right leg gives out with weakness, and that he has had a flare of IBS cramping, bloating and diarrhea.  Id. at 770.  Dr. Hart noted that Plaintiff had poor eye contact and depressed mood.  Id. at 771.  On October 13, 2017, Plaintiff was seen at the emergency department for low back pain radiating to his right hip.  Id. at 693.  Straight leg raising test was positive on the right at 15 degrees with some back spasm.  Id. at 694, 850.  X-ray of the spine was normal, id. at 699, 855, and a CT scan revealed a 2 mm kidney stone in the right ureter.  Id. at 694, 700-01.  Plaintiff was given Toradol and was released with Percocet for pain, Zofran, and Flomax.[13]  Id. at 694-95, 851.

On October 24, 2017, Plaintiff reported to Michael Cassidy, M.D., his treating gastroenterologist, that his symptoms of IBS were worsening, causing him to move his bowels 3-to-10 times per day.  Tr. at 882.  At that time, he was not suffering from fecal incontinence.  Id.  Dr. Cassidy discontinued Bentyl and started Plaintiff on Viberzi.[14]  Id.

---

[13]Toradol is a nonsteroidal anti-inflammatory drug used short-term to treat moderate to severe pain.  See https://www.drugs.com/toradol.html (last visited Sept. 27, 2022).  Percocet contains a combination of oxycodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone, used to relieve moderate to severe pain.  See https://www.drugs.com/percocet.html (last visited Sept. 27, 2022).  Zofran (generic ondansetron) is an anti-nausea medication used to prevent nausea and vomiting.  See https://www.drugs.com/zofran.html (last visited Sept. 27, 2022).  Flomax is an alpha-blocker that relaxes the muscles in the prostate and bladder neck used to improve urination in men with benign prostatic hyperplasia.  See https://www.drugs.com/flomax.html (last visited Sept. 27, 2022).

[14]Bentyl (generic dicyclomine) is used to treat IBS.  See https://www.drugs.com/bentyl.html (last visited Oct. 3, 2022).  Viberzi is used to treat IBS when the main symptom is diarrhea by working in the intestines to slow the movement of food during digestion and making the nerves of the intestines less sensitive to stimulation.  See https://www.drugs.com/viberzi.html (last visited Oct. 3, 2022).

On March 30, 2018, Plaintiff saw Dr. Hart with complaints of muscle aches, joint pains, and back pain that was described as tolerable, and bloating and cramping.  Tr. at 909.  Dr. Hart increased Plaintiff's gabapentin to address his back pain, and continued his prescriptions for Ambien for insomnia, dicyclomine, Omeprazole, and ondansetron for his bowel and gastric issues, and bupropion and duloxetine for depression.[15]  Id. at 910. On May 5, 2018, Plaintiff was seen at the emergency department for rib pain following a sneeze.  Id. at 844-47.  There was no fracture on x-ray and Plaintiff was released on tramadol and Tylenol.[16]  Id.  at 846.  Plaintiff followed up with his primary care practice a few weeks later continuing to complain of rib pain.  Id. at 906.  Nurse practitioner ("NP") Danielle Festa, diagnosed Plaintiff with a sprain of the costal cartilage and continued Plaintiff on tramadol for two weeks.  Id.  On June 12, 2018, NP Festa refilled the prescription for tramadol, referred Plaintiff to Highpoint Pain Management to address the ongoing rib pain, and referred Plaintiff for a medical cannabis evaluation to address his chronic pain syndrome.  Id. at 904-05.

---

[15]Ambien is a sedative used to treat insomnia.  See https://www.drugs.com/ambien.html (last visited Oct. 3, 2022).  Omeprazole is used to treat excess stomach acid in GERD, among other conditions.  See https://www.drugs.com/omeprazole.html (last visited Oct. 3, 2022).  Bupropion (brand name Wellbutrin) is an antidepressant used to treat Major Depressive Disorder ("MDD"). See https://www.drugs.com/bupropion.html (last visited Oct. 3, 2022).  Duloxetine is an antidepressant used to treat MDD and general anxiety disorder.  See https://www.drugs.com/duloxetine.html (last visited Oct. 3, 2022).

[16]Tramadol is a synthetic opioid used to treat moderate to severe pain.  See https://www.drugs.com/tramadol.html (last visited Oct. 3, 2022).

Plaintiff returned to Dr. Cassidy complaining of worsening diarrhea on May 10, 2018.  Tr. at 879.  Although Plaintiff "responded nicely" to Viberzi, his insurance would not cover the medication.  Id.  At that time, Plaintiff reported moving his bowels 6-10 times a day and intermittent fecal incontinence.  Id. at 880.  Dr. Cassidy prescribed rifaximin[17] and told Plaintiff to continue Bentyl and ordered labwork.  Id. at 879.  In August, Plaintiff reported to Dr. Cassidy that he was moving his bowels 10-30 times a day and that he experienced nocturnal stooling and fecal incontinence.  Id. at 877.  The doctor again prescribed Viberzi.  Id.  A colonoscopy performed on August 20, 2018, showed erythema[18] in the whole colon and internal hemorrhoids.  Id. at 885.

On September 18, 2018, Plaintiff again saw NP Festa complaining of left shoulder pain from a pulled muscle.  Tr. at 902.  NP Festa noted limited range of motion, muscle hypertrophy,[19] tenderness at the left trapezius and pain in the cervical spine, and prescribed prednisone[20] and neck and shoulder exercises.  Id. at 902-03.

Plaintiff followed up with Dr. Cassidy on October 17, 2018, complaining of persistent worsening diarrhea, moving his bowels 15-20 times a day and having some

---

[17]Rifaximin is used to treat diarrhea caused by Escherichia coli (E. coli) and to treat IBS.  See https://www.drugs.com/mtm/rifaximin.html (last visited Oct. 3, 2022).

[18]Erythema is redness of the tissue caused by congestion of the capillaries.  DIMD at 643.

[19]Hypertrophy is "the enlargement or overgrowth of an organ or part due to the increase in size of its constituent cells."  DIMD at 898.

[20]Prednisone is a corticosteroid used to decrease inflammation.  See https://www.drugs.com/prednisone.html (last visited Oct. 3, 2022).

fecal incontinence, and the doctor noted that a stool culture showed fecal leucocytes.[21]

Id. at 875.  The doctor prescribed alosetron[22] and discontinued Viberzi.  Id.   On

December 26, 2018, Plaintiff complained to Dr. Cassidy of abdominal pain and diarrhea

20-30 times a day.  Id. at 873.  Dr. Cassidy stopped Plaintiff's Bentyl and started Plaintiff

on amitriptyline and Imodium A-D.[23]  Id.

On January 28, 2019, Plaintiff saw Dr. Hart complaining of ongoing left side pain

that began a month prior, including pain in the left hip.  Tr. at 898.  Rather than ordering

a CT scan, Dr. Hart awaited MRI results from testing ordered by Plaintiff's

gastroenterologist for IBS.  Id. at 901.

On May 14, 2019, Plaintiff was seen by Andrew Isleib, D.O., at Performance

Spine & Sports Physicians for chronic neck, shoulder, back, hip, and left rib pain.  Tr. at

946, 1045.  The doctor diagnosed Plaintiff with fibromyalgia, low back pain, cervicalgia,

myalgia of auxiliary muscles of the head and neck, and ordered x-rays of Plaintiff's spine

and shoulders.  Id.  The x-rays of the pelvis and hips, shoulders, lumbar and thoracic

---

[21]Fecal leucocytes, or white blood cells in the stool, is a sign of inflammation in
the digestive tract. See
https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contenti
d=stool_wbc (last visited Sept. 30, 2022).

[22]Alosetron is used to block serotonin in the intestines, slowing the movement of
stools through the intestines.  See https://www.drugs.com/mtm/alosetron.html (last
visited Oct. 3, 2022).

[23]Amitriptyline is an antidepressant with sedative effects.  See
https://www.drugs.com/amitriptyline.html (last visited Oct. 3, 2022).  Imodium A-D is
used to treat diarrhea by slowing the rhythm of digestion so the small intestines have
more time to absorb fluid and nutrients.  See https://www.drugs.com/imodium.html (last
visited Oct. 3, 2022).

spine were unremarkable but for indications of a kidney stone.  Id.  at 1031, 1033, 1034, 1035, 1048, 1051-52, 1053, 1054.   X-ray of the cervical spine showed mild degenerative changes at C5-6 and C6-7.  Id. at 1032, 1049.  MRI of the abdomen was also unremarkable.  Id. at 1036, 1055-56.

On June 18, 2019, with all of the x-rays "benign," Dr. Isleib ordered labwork to consider fibromyalgia, tick-borne myalgias, or an autoimmune process.  Tr. at 1041.  On July 9, 2019, Plaintiff returned, but had not gotten the labwork done.  Id. at 1037.  Dr. Isleib referred Plaintiff for aquatherapy.  Id.

On December 21, 2017, at the initial review stage, Sanjay Gandhi, M.D., concluded that Plaintiff's physical impairments were not severe.  Tr. at 212-14, 228-30.

### 2. Psychological/Psychiatric/Neurologic Treatment

Plaintiff was diagnosed as a child with perinatal encephalopathy,[24] a learning disability, ADHD, Tourette's Syndrome, seizures, and optic nerve hypoplasia.[25]  See tr. at 820, 954-55, 958, 960, 965, 969.[26]  In adulthood and approaching his alleged onset date, Plaintiff began outpatient treatment at the Penn Foundation on October 31, 2016, complaining of concentration and memory problems, insomnia, and anxiety.  Id. at 820, 823.  On examination, Olga Kissel, M.D., noted that Plaintiff's memory, attention, and

---

[24]Encephalopathy is any degenerative disease of the brain.  DIMD at 614.

[25]Hypoplasia is the "incomplete development or underdevelopment of an organ or tissue."  DIMD at 905.

[26]Plaintiff reported to a vocational counselor that he "grew out of seizures" when he was 11 or 12 years old.  Tr. at 928.

concentration were impaired, id. at 822, and prescribed Welbutrin and Ambien.  Id. at 823.  In November, Dr. Kissel noted that Plaintiff's depression was stable on Wellbutrin, his insomnia continued, and his memory, attention, and concentration were impaired.  Id. at 1098-99.  In December, the doctor indicated that Plaintiff was less depressed, his sleep was good with medication, and his memory and concentration were improving.  Id. at 1096.  When Plaintiff saw Dr. Kissel on June 27, 2017, she noted that he had two panic attacks in the prior three weeks with palpitations, shaking, and shortness of breath, and his sleep was poor due to his pain.  Id. at 1088.  The doctor prescribed propranolol[27] to address the anxiety/panic attacks.  Id. at 1089.  In July, the doctor noted that Plaintiff's memory, attention, and concentration were intact, his depression was stable on Wellbutrin, and his anxiety was stable on propranolol, but his insomnia was worse, for which she added Remeron[28] to his regimen.  Id. at 1086.

As previously mentioned, on September 15, 2017, Plaintiff was seen at the Grand View Hospital Emergency Department and admitted for an overdose of tizanidine.  Tr. at 667-70.  In his visit with Dr. Kissel a few weeks before the overdose, Plaintiff reported that he was anxious, including about financial problems, and having not told his parents that he was unemployed.  Id. at 1082.  When he followed up with Dr. Kissel a week after the overdose, Plaintiff explained that his overdose was an attempt to get his parents'

---

[27]Propranolol is a beta blocker used to treat tremors, angina, hypertension, heart rhythm disorder sand other heart or circulatory conditions.  See https://www.drugs.com/propranolol.html (last visited Oct. 3, 2022).

[28]Remeron (generic mirtazapine) is an antidepressant used to treat MDD.  See https://www.drugs.com/remeron.html (last visited Oct. 3, 2022).

attention, and the doctor described Plaintiff as manipulative.  Id. at 1081.[29]  When Dr. Kissel saw Plaintiff on October 17, 2017, she noted that his anxiety was controlled and he was less depressed, but his insomnia persisted.  Id. at 818-19.  In December, the doctor noted that Plaintiff's memory, attention, and concentration were impaired.  Id. at 1078.  On February 6, 2018, Dr. Kissel noted that Plaintiff's mood was stable, his anxiety controlled, his was sleeping better, his memory, attention, and concentration were intact, and he did not need propranolol any longer.  Id. at 1076.

Plaintiff was seen again at the Grandview Hospital Emergency Department on November 9, 2018, with suicidal and homicidal ideation.  Tr. at 831-33.  Plaintiff presented with a depressed mood and flat affect and made suicidal statements to a crisis worker, and an involuntary commitment was initiated.  Id. at 833.  He was treated inpatient from November 10 to November 19, 2018, at Montgomery County Emergency Service.  Id. at 944, 1002-28.  On admission, Plaintiff was suffering from auditory and visual hallucinations, homicidal ideation, and paranoid ideation.  Id. at 1003.  He was diagnosed with MDD, recurrent, moderate, and discharged when stable on Viberzi, Ambien, Gabapentin, Wellbutrin, Abilify, mirtazapine, omeprazole, Singulair, Bentyl, and Imodium.[30]  Id. at 1003-04.  When Plaintiff followed up with Dr. Kissel on December 5, 2018, she found his depression and insomnia were stable.  Id. at 1069.

---

[29]The doctor also noted that Plaintiff walks with a cane, but "moves both legs and body without distress."  Tr. at 1080.

[30]Abilify is an antipsychotic used with antidepressant medication to treat MDD. See https://www.drugs.com/abilify.html (last visited Oct. 3, 2022).  Singulair is a

During Plaintiff's March 12, 2019 visit, Dr. Kissel again described Plaintiff as manipulative, noting that Plaintiff "gets worse and suicidal after arguments with parents – they want him out of the house; he wants to get disability and stay." Tr. at 1065. In June, the doctor noted that Plaintiff's mood was depressed, and he had low energy, anhedonia, and poor sleep. Id. at 1062. In August 2019, the doctor noted that Plaintiff's depression was improving and recommended Plaintiff start melatonin[31] in addition to Ambien and Remeron for his insomnia. Id. at 1060-61.

On December 8, 2017, at the initial review stage, Roger Fretz, Ph.D., found that Plaintiff suffered from neurodevelopmental disorders and had a moderate limitation in the abilities to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace; and a mild limitation in the ability to adapt or manage oneself. Tr. at 215, 230.[32]

---

leukotriene inhibitor used to prevent asthma attacks and treat symptoms of year-round allergies. See https://www.drugs.com/singulair.html (last visited Oct. 3, 2022).

[31]Melatonin is a natural hormone that helps to maintain the wake-sleep cycle. See https://www.drugs.com/melatonin.html (last visited Oct. 3, 2022).

[32]The record also contains a Vocational/Educational Neurospsychological Evaluation prepared by Donald Masey, Psy.D., on September 14, 2016, prior to Plaintiff's alleged disability onset date. Tr. at 926-42. Among other things and relevant to one of Plaintiff's claims, Dr. Masey found based on Plaintiff's and his father's ratings that Plaintiff has "difficulty regulating his emotions, adjusting to changes in routine or demands of a task, planning and organizing problem-solving approaches, and paying attention to task-oriented information." Id. at 938.

D.   **Plaintiff's Claims**

1.   RFC – Limitation Relating to Adapting & Managing Oneself

Plaintiff argues that the ALJ did not incorporate any limitation in the RFC assessment corresponding to her finding of a marked limitation in adapting and managing oneself, and that the vague limitation to a stable work environment was insufficient. Doc. 17 at 6-14; Doc. 19 at 6-9.  Defendant responds that the ALJ validly explained her reasoning for the limitations contained in the RFC assessment and adequately addressed the marked limitation in adapting and managing oneself.  Doc. 18 at 5-7.

The inter-relationship of the findings at Step 3 involving the B criteria of the mental health Listings and the RFC assessment has been the focus of several opinions in this circuit, culminating in the Third Circuit's decision in Hess v. Commissioner of Social Security, 931 F.3d 198 (3d Cir. 2019).  In Hess, the court reiterated that the findings at Step 3 must be "adequately conveyed" in the RFC assessment.  Id. at 210 (citing Ramirez v. Barnhart, 372 F.3d 546, 552 n.2 & 554 (3d Cir. 2004)).  "In short, the functional limitation findings [of Step 3] do not dictate the terms of the ALJ's statement of the claimant's limitation in the final analytical steps.  But those findings are relevant to that statement of the limitation, which must be sufficient to reflect all of a claimant's impairments."  Id.  In order to determine the sufficiency of the ALJ's RFC assessment, "it is essential to assess whether a valid explanation has been given for [the RFC assessment]."  Id. at 213.[33]

---

[33]In Hess, the question was whether the ALJ's limitation to "simple tasks" in the RFC assessment was sufficient to address the moderate difficulties in concentration,

Adapting and managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting," and includes "managing . . . psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00(E)(4). The ALJ explained her finding of marked limitation in Plaintiff's ability to adapt or manage himself as follows:

> [Plaintiff] could handle self-care and personal hygiene, care for pets, and care for a child, and the objective evidence in the record showed [Plaintiff] to have appropriate grooming and hygiene ([tr. at 510-20, 1059-99], and Testimony). However, [Plaintiff] has attempted [to] manipulate his parents with suicidal gestures instead of managing his emotions and adapting to the situation (id. at 1059-99]).

Id. at 16. During a thorough review of Plaintiff's mental health treatment evidence, see id. at 20-24, the ALJ noted Dr. Kissel's observation that Plaintiff "usually got worse and suicidal after arguments with his parents." Id. at 24 (citing id. at 1064-65); see also id. at 20 (citing records of Plaintiff's mental health treatment and noting that "Plaintiff's symptoms appear to remain stable with such treatment and his symptom exacerbations tend to parallel life stressors such as conflict with his parents, issues with employment,

---

persistence, and pace the ALJ found at Step 3. 931 F.3d at 200-01. Based on the ALJ's discussion, the Third Circuit found that the ALJ provided "a valid explanation for [a] 'simple tasks' limitation . . . [because] the ALJ explained at length and with sound reasoning why Hess's 'moderate' difficulties in 'concentration, persistence, or pace' were not so significant that Hess was incapable of performing 'simple tasks.'" Id. at 213.

financial issues, and bereavement issues.").  Several of the limitations contained in the ALJ's RFC assessment serve to reduce the stressors on Plaintiff and specifically address the activities identified as related to adapting or managing oneself, including the limitations to simple, routine, repetitive tasks; occasional interaction with others; no production-pace work; work in a stable environment; and no unprotected heights or unguarded moving machinery.  Id. at 17.  Here, contrary to Plaintiff's assertion that the ALJ did not incorporate limitations corresponding to her finding of a marked limitation in this area, the ALJ reviewed the evidence and included limitations targeted specifically at Plaintiff's deficiencies in the area of adapting and managing oneself.  See Davison v. Comm'r of Soc. Sec., Civ. No. 18-15840, 2020 WL 3638414, at *7 (D.N.J. July 6, 2020) ("A finding that a claimant has marked or moderate limitations does not automatically require an RFC that she cannot function in those areas at all.  It is the role of the ALJ to craft the RFC.").

Plaintiff argues that, because "the ALJ's opinion is unclear as to whether [s]he accounted for Plaintiff's marked limitations in adapting and managing [one]self in [her] mental RFC finding . . .  remand is necessary."  Doc. 17 at 11 (quoting Krill v. Saul, Civ. No. 18-152, 2019 WL 3944004, at *4 (W.D. Pa. Aug. 21, 2019)); see also Doc. 19 at 7-8 (quoting Krill, 2019 WL 3944004, at *4 ("ALJ must clarify his findings with respect to the marked limitations on Plaintiff's ability to adapt and manage herself . . .  and validly explain how . . .  his RFC finding accounts for such limitations.")).  Because the ALJ provided a valid explanation for the limitations contained in the RFC assessment, I reject Plaintiff's argument that remand is necessary.

Finally, Plaintiff complains that the ALJ's limitation to "a stable work environment . . . where his duties will not change on a daily basis" does not address the severity of his marked limitation as noted by Dr. Masey in his vocational report.  Doc. 17 at 13.  Dr. Masey prepared his vocational/educational neuropsychological report in September 2016.  Tr. at 926-42.  Plaintiff worked close to full time as a home health aide for six months to a year at Peaceful Living after Dr. Masey completed his report.  Id. at 140.  Moreover, Dr. Masey did not suggest that Plaintiff was disabled and identified jobs that might interest Plaintiff.  Id. at 939-40.  The ALJ referenced Dr. Masey's evaluation, noting that testing revealed a full scale IQ score of 84 and the absence of any significant diffuse range neuropsychological deficits.  Id. at 20.  I find no error in the ALJ's consideration of Dr. Masey's report.

### 2.   Evidence Regarding IBS

Plaintiff next complains that the ALJ improperly disregarded evidence regarding his IBS.  Doc. 17 at 15-17; Doc. 19 at 1-5.  Specifically, Plaintiff complains that the ALJ "was presented with four years of gastroenterological records and Plaintiff's testimony" that his IBS was out of control, but disregarded all of that evidence.  Doc. 17 at 16; Doc. 19 at 5.  Defendant responds that substantial evidence supports the ALJ's conclusions regarding Plaintiff's IBS and argues that the record lacks evidence supporting disabling IBS.  Doc. 18 at 7-10.

"The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the

21

evidence, the ALJ may choose which evidence to credit and which evidence not to credit,

so long as she does not "reject evidence for no reason or for the wrong reason."

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at

429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

   The record contains the records of Dr. Cassidy, Plaintiff's treating

gastroenterologist, which the ALJ reviewed in her discussion of the medical evidence.

See tr. at 19-20.  Those records evidence Plaintiff's complaints of increasing symptoms

of IBS, including the frequency of his bathroom trips and fecal incontinence, and Dr.

Cassidy's medication changes in an effort to alleviate Plaintiff's symptoms.  Id. at 619

(4/1/16 – chronic loose stools and an instance of incontinence), 622 (5/9/16 – chronically

loose stools provoked by food, failed to get labwork done), 882 (10/24/17 – frequency of

3-10 times a day, no incontinence, start Viberzi, stop Bentyl), 879 (5/10/18 – frequency

of 6-10 times per day and intermittent incontinence, start rifaximin, continue Bentyl, stop

Levsin), 877 (8/1/18 – persistent worsening diarrhea, frequency of 10-30 times per day,

start Viberzi, continue Bentyl), 875 (10/17/18 – frequency of 15-20 times per day with

some incontinence, fecal leukocytes, start alosteron, continue Bentyl, discontinue

Viberzi), 873 (12/26/18 – multiple loose bowel movements, and occasional incontinence,

start amitriptyline and Imodium, stop Bentyl).  In addition, Plaintiff's colonoscopy report

from August 20, 2018, revealed erythema in the entire colon.  Id. at 884.

   The ALJ specifically found that Plaintiff's "statements about the intensity,

persistence, and limiting effects of his symptoms . . . are inconsistent because the

objective medical evidence and treatment history do not support such allegations.  Tr. at

19.  The portions of Dr. Cassidy's records upon which Plaintiff relies were Plaintiff's

complaints of bowel frequency and incontinence.  The labwork that Dr. Cassidy ordered

showed only positive fecal leucocytes, indicating inflammation.  "Other stool studies

negative.  Colonoscopy with biopsies negative, Blood work including pancreatic

hormone levels negative."  Id. at 875.  Moreover, as noted by the ALJ, Plaintiff denied GI

difficulties to other health providers after his December 26, 2018 visit to Dr. Cassidy,

indicating that his symptoms were controlled.  See id. at 20 (citing id. at 898 – 1/28/19 -

reporting to Dr. Hart that "[b]owels are moving normally on the loose side"); see also id.

at 1046 (5/14/19 – denied bowel incontinence to Dr. Isleib), 1042 (6/18/19 – same), 1038

(7/9/19 – same).  Therefore, the ALJ's rejection of Plaintiff's complaint of uncontrolled

IBS was supported by substantial evidence in the record.

Plaintiff also complains that the ALJ provided no meaningful explanation for the

off-task limitation.  Doc. 17 at 17.  As previously mentioned, the ALJ included a 10%

off-task limitation to account for additional bathroom breaks.  Tr. at 17.  Plaintiff cites to

two out-of-circuit cases in support of this argument.  Both are distinguishable.  First, in

Peterson v. Berryhill, the court found that the ALJ erred in failing to include any off-task

limitation to provide for bathroom breaks.  363 F. Supp.3d 651, 660 (D.S.C. 2019).

Notably, "[t]he ALJ did not take specific issue with Plaintiff's credibility," but failed to

account for his claims of bathroom usage ten times a day for fifteen to thirty minutes

each, despite evidence supporting Plaintiff's claim.  Id. at 661-62.  Here, the ALJ found

that Plaintiff's claims regarding bathroom frequency were not supported by the objective

medical evidence and, as previously discussed, the ALJ's conclusion is supported by

substantial evidence.  In McNeely v. Saul, the ALJ found that Plaintiff would be off-task for nine percent of the day, attributable to three impairments:  a moderate restriction in maintaining concentration, persistence, and pace; a moderate restriction in understanding, remembering, and applying information, and her testimony that she required frequent bathroom breaks.  Civ. No. 20-158, 2020 WL 5648214 (Proposed Findings) (S.D.W.V. Sept. 4, 2020) (adopted 2020 WL 5649483 (S.D.W.V. Sept. 22, 2020)).  The court found that it was "impossible for the reviewing Court to determine if the ALJ's assessment . . . is supported by substantial evidence without knowing the basis for the figure." Id., 2020 WL 5648214, at *8.

The ALJ's decision must be sufficiently detailed to permit "meaningful judicial review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119 (3d Cir. 2000).  Here, the ALJ's off-task assessment is clearly attributable to Plaintiff's IBS symptoms.  As discussed previously, the ALJ did not find that Plaintiff's complaints (including needing to use the bathroom 20-30 times a day) were supported by the medical record and this decision is supported by substantial evidence.  The record is lacking in medical evidence that Plaintiff's IBS would cause him to be off-task more than 10% of the workday.  See Burke v. Comm'r of Soc. Sec., Civ. No. 19-14148, 2020 WL 2989081, at *3 (D.N.J. June 4, 2020) ("Plaintiff has not mustered the evidence to show that [incontinency] would result in Plaintiff's being off-task more than 10% of the workday.").

### 3.    New Evidence Remand

Finally, Plaintiff argues in the alternative that the case should be remanded for consideration of new and material evidence.  Doc. 17 at 20-22.  Defendant responds that

Plaintiff has failed to establish good cause for failing to present the evidence to the ALJ with respect to one piece of evidence and that the others are not material to the period adjudicated.  Doc. 18 at 10-12.

After the ALJ's decision, Plaintiff's counsel forwarded treatment records from the Penn Foundation, Creative Health Services of Pottstown, and Plaintiff's gastroenterology practice.  Tr. at 41-99, 100-119, 120-28.  Plaintiff's new evidence claim refers to three gastroenterology reports dated August 28, 2019 (id. at 113-17), March 4, 2020 (id. at 108-12), and April 15, 2020 (id. at 101-07), which show that Plaintiff's IBS symptoms had grown worse.  Doc. 17 at 20.[34]

In the Third Circuit, evidence not before the ALJ cannot be used to seek a remand under sentence four of 42 U.S.C. § 405(f) on the ground that the ALJ's decision was not supported by substantial evidence.  Matthew v. Apfel, 239 F.3d 589, 591-93 (3d Cir. 2001); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991).  Instead, evidence submitted for the first time after the ALJ's decision under review is relevant to a request for a remand under sentence six of 42 U.S.C. § 405(g), which requires the claimant to show that the additional "evidence is new and material and . . . there was good cause why it was not previously presented to the ALJ."  Matthews, 239 F.3d at 593.

To be "new," the evidence must not have been "in existence or available to the claimant at the time of the administrative proceeding."  Sullivan v. Finkelstein, 496 U.S.

---

[34]The Appeals Council concluded that the August 28, 2019 record did not show a reasonable probability of a different outcome, and that the other two records did not relate to the period at issue.  Tr. at 2.

617, 626 (1990); see also Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).  To be

"material," the evidence must be "relevant and probative," meaning that there is a

reasonable probability that it would have changed the ALJ's decision had it been

presented.  Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).

Lastly, a claimant must demonstrate "good cause" for his failure to acquire and present

post-hearing evidence to the ALJ in a timely manner.  Id. at 833; Jones, 954 F.2d at 128.

Claimants bear the burden of showing that the three requirements are satisfied.  42 U.S.C.

§ 405(g) (sentence six).

Here, Plaintiff has failed to explain why the treatment note from August 28, 2019

was not available to him to present to the ALJ, who did not issue her decision until

October 10, 2019.  At the hearing, neither Plaintiff nor his counsel mentioned this

appointment which was less than a week after the hearing, and counsel indicated that the

record was complete.  Tr. at 133-34.  Thus, Plaintiff has failed to establish good cause for

his failure to present this particular treatment note to the ALJ as required for a new

evidence remand.

The treatment notes from March and April 2020 are not relevant to period under

review.  The ALJ issued her decision on October 10, 2019.  These two records evidence

visits nearly-five and six months later, when Plaintiff complained of worsening diarrhea

"for the past few weeks."  Tr. at 109.  At this point, the differential diagnosis included

"IBS flare" several months after the relevant period.  Id. at 108.  This evidence is not

material to the period under review.

**IV.**   <u>**CONCLUSION**</u>

The ALJ's decision is supported by substantial evidence.  The ALJ properly accounted for the marked limitation in adapting and managing oneself in the RFC assessment.  The ALJ properly considered the evidence concerning Plaintiff's IBS and Plaintiff failed to establish that the ten percent off-task limitation was insufficient to address his need for bathroom breaks.  Plaintiff's request for a new-evidence remand also fails because Plaintiff failed to establish good cause for failing to present the August 2019 treatment note to the ALJ and the March and April 2020 treatment notes are not material to the relevant adjudicatory period.

An appropriate Order follows.